**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| 2nd Gen Plumbing, LLC, individually and on behalf of all others similarly situated, | Case. No. _____ |
| *Plaintiff*. | |
| v. | **CLASS ACTION COMPLAINT** |
| RB GLOBAL, INC.; ROUSE SERVICES LLC; UNITED RENTALS, INC.; SUNBELT RENTALS, INC.; HERC RENTALS INC.; HERC HOLDINGS INC.; H&E EQUIPMENT SERVICES, INC.; & SUNSTATE EQUIPMENT CO., LLC, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff 2nd Gen Plumbing, LLC ("Plaintiff" or 2nd Gen"), individually and on behalf of all others similarly situated (the "Class" as defined herein), based upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all members of the Class, and based upon the investigation of counsel, hereby brings this civil antitrust action to recover treble damages, injunctive relief, and/or such other relief as deemed appropriate, against Defendants RB Global, Inc. ("RB Global"), its wholly owned subsidiary Rouse Services LLC ("Rouse" or collectively with RB Global, the "Rouse Defendants"), and major construction equipment rental companies United Rentals, Inc., Sunbelt Rentals, Inc., HERC Rentals Inc., HERC Holdings Inc., H&E Equipment Services, Inc., and Sunstate Equipment Co., LLC (collectively referred to as the "Rental Company Defendants" or, including the Rouse Defendants, the "Defendants"), for conspiring to artificially increase construction equipment rental prices nationwide.

## I. SUMMARY OF ALLEGATIONS

1. This action arises from an unlawful agreement between Defendants, which include some of the largest construction equipment rental companies in the United States, to artificially increase and fix the prices of rental construction equipment used in both residential and commercial construction projects throughout the United States.

2. The rental equipment includes equipment such as earth moving machinery, material handling equipment, and concrete and road construction machinery. The rented equipment can include aerial work platforms, earth-moving equipment, forklifts, light towers, bulldozers, excavators, hoes, skid steer loaders, compaction equipment, cranes, trench safety equipment, generators, HVAC equipment, fluid solutions equipment, mobile storage equipment, modular office space, plumbing equipment, pumps, surface protection mats, power tools, trucks, trailers, and welders. Industry participants ordinarily use "construction equipment" to refer to large, heavy equipment and components of such equipment, rather than smaller tools.

3. Construction rental equipment customers and their uses of said equipment include the following:

   a. Construction companies that use equipment for constructing and removing commercial buildings, warehouses, industrial and manufacturing plants, office parks, airports, residential developments, and other facilities;

   b. Industrial companies such as manufacturers, chemical companies, paper mills, railroads, ship builders and utilities, that use equipment for plant maintenance, upgrades, expansion and construction;

   c. Municipalities that require equipment for a variety of purposes; and

2

      d.   Homeowners and other individuals who use equipment for projects that range from simple repairs to major renovations.

4.    Upon information and belief, the Rental Company Defendants created an unlawful Cartel with Rouse to effectuate their price fixing conspiracy. This conspiracy has artificially inflated the cost of renting construction equipment to individuals and entities like Plaintiff.

5.    Defendant Rouse created a benchmarking platform that collects competitively sensitive information ("CSI") from its clients, including the Rental Company Defendants, on a daily basis and provides benchmark reports back to its clients that include rental rates, fleet utilization information, and other key performance metrics.

6.    Rouse markets this benchmarking platform as a means for construction rental equipment providers to simply compare rental and fleet utilization rates and optimize their business. In truth, it is simply a means to carry out their unlawful price-fixing conspiracy.

7.    Rouse, through its benchmarking program, enables the Rental Company Defendants to raise, fix, and stabilize the rental prices for construction equipment throughout the United States.

8.    The Rental Company Defendants used the Rouse data to collude and coordinate setting their prices, even when market pressures would have normally resulted in price reductions. Defendants proudly refer to this a "price discipline" but it is clear evidence that the Rental Company Defendants agreed that they would not compete with each other on the basis of price.

9.    Defendants have been extremely successful as a result. Rental Company Defendants have been increasing their rental prices and collecting record revenues year after year. And Rouse itself now counts more than 400 construction equipment rental clients as subscribers to its platform and is the go-to benchmarking system used by the industry.

10. The lack of competition has caused Plaintiff and members of the Class harm in the form of supra-competitive prices for Rental Equipment during the Class Period. Plaintiff brings this class action Complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act and violations of common law.

11. Plaintiff seeks to represent a class consisting of persons and entities who rented construction equipment in the United States from at least as early as March 31, 2021, through the present (the "Class Period") from the Rental Company Defendants.

## II. JURISDICTION AND VENUE

12. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26). This action seeks compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

13. This Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

14. This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).

15. A substantial part of the events or omissions giving rise to the claims occurred in this District. Upon information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

16. Defendants' activities were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

17.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and the Class members. Defendants, directly and through their agents, engaged in activities affecting all states.

18.     Defendants' conspiracy, wrongful anticompetitive conduct and resulting substantial anticompetitive effects described herein proximately caused injury to Plaintiff and members of the proposed Class.

19.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C.§ 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III.     PARTIES

### A. Plaintiff

20.     Plaintiff 2nd Gen Plumbing LLC (hereinafter, "Plaintiff" or "2nd Gen") is a Michigan limited liability company with a registered office located in Troy, Michigan.   Plaintiff provides plumbing services to homeowners.   Plaintiff regularly rents construction equipment from construction equipment rental companies, including one or more of the Defendants.

### B. Rouse Defendants

21.     Defendant RB Global, Inc. ("RB Global") is a publicly traded company, listed on the Toronto and New York Stock Exchanges and is legally domiciled in Canada with its U.S. headquarters located at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154.

22.     Defendant Rouse Services LLC ("Rouse") is a wholly owned subsidiary of RB Global ("RB Global" or collectively with Rouse, "Rouse Defendants"), with its headquarters

located at 8383 Wilshire Boulevard, Suite 900l, Beverly Hills, California 90211. Rouse was acquired by RB Global for $275 million in 2020.

### C. Rental Company Defendants

23. Defendant United Rentals, Inc. ("United Rentals") is a publicly traded company, incorporated in Delaware, with its principal place of business located at 100 First Stamford Place, Suite 700, Stamford, Connecticut 06902. United Rentals is principally a holding company and conducts its operations through its wholly owned subsidiary, United Rentals (North America), Inc., and its subsidiaries.

24. United Rentals is the largest equipment rental company in the world, with over 1,400 retail locations across North America. United Rentals maintains approximately twenty percent (20%) of the nationwide market for equipment rentals.

25. United Rentals has earned increasing profits year after year. Rental revenue for the fourth quarter of 2024 increased 9.7% year-over-year to a fourth quarter record of $3.422 billion. In 2024, the company also earned an annual gross profit of $6.15 billion, marking a 5.8% increase from $5.813 billion in 2023.

26. United Rentals' annual revenue for 2024 was $15.345B, a 7.07% increase from 2023. Its annual revenue for 2023 was $14.332B, a 23.11% increase from 2022, and annual revenue for 2022 was $11.642B, a 19.82% increase from 2021.[1]

27. United Rentals' annual gross profit for 2024 was $6.15B, a 5.8% increase from 2023. In 2023, annual gross profit was $5.813B, a 16.35% increase from 2022. And in 2022, annual gross profit was $4.996B, a 29.67% increase from 2021.[2]

---

[1] *United Rentals Revenue 2010-2024 | URI*, Macrotrends, at https://www.macrotrends.net/stocks/charts/URI/united-rentals/revenue
[2] *United Rentals Gross Profit 2010-2024 | URI*, Macrotrends, at https://www.macrotrends.net/stocks/charts/URI/united-rentals/gross-profit.

28.     United Rentals has a history of engaging in acquisitions to increase its footprint in the market.[3]  In 2017, United Rentals acquired NES Rental Holdings II, Inc., for $965 million, and NEFF Corporation, for $1.3 billion.[4]  At the time, these companies were among the top ten (10) rental companies in the country, and both were original participants in the Rouse.  In 2018, United Rentals completed several more acquisitions, including BlueLine Rental for $2.1 billion.[5]  In 2021, United Rentals acquired, among other companies, Franklin Equipment, LLC.[6]  In 2022, United Rentals completed its acquisition of Ahern Rentals, Inc. for $2 billion.[7]  United Rentals touted that "[t]he transaction adds approximately 2,100 employees, 60,000 rental assets and 106 locations to United Rentals in the United States."[8]  In 2025, United Rentals also sought to acquire Defendant H&E, but has since withdrawn from that acquisition.[9]

29.     Defendant Sunbelt Rentals, Inc. ("Sunbelt Rentals") is a North Carolina corporation with its principal place of business located at 1799 Innovation Point, Fort Mill, North Carolina 29715. Sunbelt Rentals is the second largest equipment rental company in the country, with more than 1,200 locations in the U.S. and 14,000 types of equipment for rent.[10]

---

[3]  *TIMELINE: Acquisition History*, United Rentals, at https://www.unitedrentals.com/our-company/about-us/acquisition-history.
[4]  *Id.*
[5]  *Id.  See also United Rentals to Acquire BlueLine Rental for $2.1 billion*, United Rentals (Sep. 10, 2018), at https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-acquire-blueline-rental-21-billion.
[6]  *United Rentals Acquires Franklin Equipment*, United Rentals (Apr 14, 2021), at https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-acquires-franklin-equipment.
[7]  *United Rentals Completes Acquisition of Ahern Rentals*, United Rentals (Dec. 7, 2022), at https://investors.unitedrentals.com/press-releases/press-releases-details/2022/United-Rentals-Completes-Acquisition-of-Ahern-Rentals/default.aspx.
[8]  *Id.*
[9]  *United Rentals, Inc. Will No Longer Pursue the Acquisition of H&E Equipment Services, Inc*., United Rentals, (Feb. 18, 2025), at https://investor-relations.unitedrentals.com/press-releases/press-releases-details/2025/United-Rentals-Inc.-Will-No-Longer-Pursue-the-Acquisition-of-HE-Equipment-Services-Inc/default.aspx.
[10]  *About Sunbelt Rentals*, at https://www.sunbeltrentals.com/about/.  *See also Ashtead Group US*, at https://www.ashtead-group.com/our-businesses/us/.

30.     Sunbelt Rentals is a division, subsidiary, or trade name of Ashtead Group PLC ("Ashtead Group"), an international equipment rental company with national networks in the US, UK, and Canada.  Ashtead Group owns and operates Sunbelt Rentals.[11]  In 2024, Sunbelt Rentals reported $9.3 billion in revenue from its U.S. business alone.  Sunbelt Rentals reported that "[r]ental revenue in the US grew by eleven percent (11%) over last year to $8,321m, which was on top of growth of twenty-four percent (24%) the previous year."[12]

31.     Sunbelt Rentals has also adopted a strategy of growth by acquisition.[13]  Over the past several years, Sunbelt Rentals has made well over 150 acquisitions.[14]

32.     Defendant HERC Holdings Inc. is the parent company of Defendant HERC Rentals Inc. (collectively, "HERC Rentals" or "HERC") and incorporated under the laws of Delaware with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. HERC Holdings Inc. is a publicly traded company listed on the New York Stock Exchange.

33.     HERC Rentals has over 451 locations in the U.S. and Canada. Its fleet represents a total original equipment cost of $7 billion.

---

[11] *Ashtead Group At A Glance*, at https://www.ashtead-group.com/about-us/at-a-glance/.

[12] *Ashtead Group Annual Report & Accounts 2024*, p. 9, available at https://www.ashtead-group.com/investors/.

[13] *Id.* at p. 15 ("Much of our market share gain comes from these small independents when we set up new stores or acquire them, and hence our runway remains long with ample opportunity for bolt-on investments.")

[14] *See, e.g.*, Michael Roth, *Sunbelt Rentals Makes 16 Acquisitions in Fiscal First Half and More in November*, Rental Equipment Register (Dec. 10, 2023), at https://www.rermag.com/mergers-acquisitions/rental-companies/article/21278915/sunbelt-rentals-makes-16-acquisitions-in-fiscal-first-half-and-more-in-november; and Michael Roth, *Sunbelt Rentals Makes 26 Acquisitions in Fiscal 2024, Adds Chicago's Rentalmax in May: Sunbelt Rentals and its parent company Ashtead plc acquired 26 rental businesses during fiscal 2024, for total cash of $845.6 million*, Rental Equipment Register (June 22, 2024).

34.     In its 2023 Annual Report, HERC Rentals reported that its equipment rental revenue increased twelve percent (12%) in 2023 on top of thirty-four percent (34%) growth in 2022.[15]

35.     In 2023, HERC Rentals reported total revenue of $3.3 billion. Its 2023 revenue from equipment rental reflected a forty-six percent (46%) increase from 2021. In 2024, its total revenue again jumped to a record $3.6 billion.

36.     HERC Rentals has also focused on acquisitions as a strategy for growth in the industry:

> We are a market consolidator, having completed 42 strategic acquisitions since launching our M&A strategy in December 2020. Today, we operate from approximately 400 physical branches, representing greater market penetration with approximately 50% more locations since becoming a standalone company in 2016.[16]

37.     Defendant H&E Equipment Services, Inc. ("H&E") is a publicly traded company incorporated in Delaware with its principal place of business located at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E was founded in 1961 and is one of the largest equipment rental companies in the U.S., with more than 160 locations nationwide.[17]

38.     In 2024, H&E's revenues totaled $1.5 billion, an increase of $47.4 million, or 3.2%, compared to $1.469 billion in 2023. H&E's total equipment rental revenues increased 5.7% to $1.253 billion compared to $1.186 Billion in the previous year. Rental revenues increased 5.4% to $1.108 billion compared to $1.051 billion in 2023.[18]

---

[15] *Herc Holdings Inc. 2023 Annual Report*, available at
https://s29.q4cdn.com/503541803/files/doc_financials/2023/ar/2023-annual-report.pdf.
[16] *Id.* at p. 1.
[17] *H&E Rentals About Us*, at https://he-equipment.com/our-company/about-us.
[18] *H&E Rentals Reports Fourth Quarter and Full Year 2024 Results* (Feb. 21, 2025), at https://investor.he-equipment.com/news-releases/news-release-details/he-rentals-reports-fourth-quarter-and-full-year-2024-results.

39.     In January 2025, United Rentals and H&E entered into an Agreement and Plan of Merger. But in February 2025, H&E received a "superior proposal" from HERC and the Agreement with United Rentals was terminated.[19] The proposed merger between H&E and HERC is currently under regulatory review.

40.     Defendant Sunstate Equipment Co., LLC ("Sunstate") is a Delaware limited liability company with its principal place of business located at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is wholly owned by the Sumitomo Corporation Group, which is a publicly traded company on the Tokyo Stock Exchange and is also listed on the New York Stock Exchange through an American Depositary Receipt.

41.     Sunstate was founded in 1977 and in 2017, was No. 7 on the Rental Equipment Register 100 and is ranked the 24th largest equipment rental company in the world according to International Rental News. [20] The company has approximately 100 branches in sixteen (16) states. As with the other Defendants, Sunstate has made strategic acquisitions of other rental companies over the years and has experienced growth in its revenue and profits over the past several years.

### D. Unnamed Co-Conspirators

42.     Various co-conspirators, known and unknown, willingly participated in and acted in furtherance of the alleged conspiracy. Each Defendant was a co-conspirator with each of the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District. Defendants are jointly and severally liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees,

---

[19] *H&E Equipment Services, Inc. Receives Superior Proposal from Herc Holdings Inc*. (Feb. 18, 2025), at https://investor.he-equipment.com/news-releases/news-release-details/he-equipment-services-inc-receives-superior-proposal-herc.
[20] Michael Roth, *Sumitomo Corp. Acquires Remaining 20 Percent of Sunstate Equipment Rental Shares*, Rental Equipment Register (Mar. 2, 2017), at https://www.rermag.com/news-analysis/headline-news/article/20951819/sumitomo-corp-acquires-remaining-20-percent-of-sunstate-equipment-rental-shares.

representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

43.     At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein.  The individuals and entities acted in concert to advance the objectives of the conspiracy to benefit Defendants and themselves through the manipulation of rental prices.

## IV.     FACTUAL ALLEGATIONS

### A.  The Construction Equipment Rental Market

44.     The construction equipment rental market comprises a significant and growing segment of the construction industry in the United States. Renting offers customers flexibility and makes it simple for businesses to scale their equipment requirements in accordance with project specifications. Customers can also access a large variety of equipment without having to worry about maintenance, storage, depreciation, or making large capital outlays.

45.     The term "construction equipment" as used in the construction industry typically refers to large, heavy equipment and its components, including but not limited to lifts, dozers, excavators, hoes, steers, compaction equipment, trench safety equipment, cranes, and loaders. Construction equipment is used in commercial and residential construction, as well as industrial sectors.

46.     Demand for rental equipment is significant and growing. Rental companies now account for approximately one-third of all new construction equipment purchases in North America. The American Rental Association (ARA) reported that the United States construction

and general tool rental industry ended 2024 as an $83.7 billion industry, which was 8% greater than 2023. The industry is projected to grow another 5.2% in 2025, totaling $87.5 billion.[21]

### 1. Prior to Rouse, Rental Companies Set Their Prices Independently Based on Supply and Demand and Their Own Costs

47.     Before Rouse's entry into the rental industry, rental companies used their own analysis of their cost, supply and demand driven factors to independently set the pricing for rental of their construction equipment.

48.     Rental Company Pricing models were historically fairly simple and generally resulted in prices for daily, weekly, and monthly rentals. The highest rates were for daily rentals, and weekly and monthly rates were usually discounted due to the longer rental periods. Prices tended to remain stable, although increased competition or other market forces sometimes accounted for substantial price declines.

49.     The introduction of the Rouse pricing platform revolutionized the industry by allowing competitors to pool their CSI and use that information to charge supra-competitive prices to Plaintiff and members of the Class.

### 2. Consolidation of the Rental Equipment Industry

50.     In the early 2000s, the construction equipment rental industry consisted of a large number of independent companies who engaged in price competition with each other to attract customers.  This competition led to lower prices and resulted in periods of broad price declines.

51.     The construction rental market has become increasingly concentrated.  As detailed above, many companies have adopted business strategies that include utilizing acquisitions as a means of growth and market penetration, and many smaller rental companies are being acquired

---

[21] Lauren Mau, *ARA's latest US and Canada economic forecast released at The ARA Show*, ARA Rental Management (Jan. 30, 2025), at https://news.ararental.org/aras-latest-us-and-canada-economic-forecast-released-at-the-ara-show.

by larger companies. Large rental companies have even engaged in acquisitions of other similarly sized companies, leading to further market consolidation.

52. The chart below is taken from an Ashtead Group (owner of Defendant Sunbelt) presentation to its investors. This chart illustrates the degree of consolidation of the market since 2010 and does not even account for United Rentals' acquisition of RSC Holdings Inc. in 2012.[22]



53. Today, the market is even more concentrated, and Rental Company Defendants comprise the majority of the construction equipment rental market in the United States. The market is predicted to consolidate even further.[23]

---

[22] Ashtead Group, Results and presentations, *Unaudited results for the half year and second quarter ended 31 October 2023 Presentation Slides* (Dec. 5, 2023), at https://www.ashtead-group.com/investors/results-centre/results-and-presentations/.

[23] Ashtead Group, Results and presentations, *Unaudited results for the nine months and third quarter ended 31 January 2025 Presentation Slides* (Mar. 4, 2025), at https://www.ashtead-group.com/investors/results-centre/results-and-presentations/.



MARKET SHARE BREAKDOWN[1,2]

### 3.  "Pricing Pain" Leads to Calls for "Pricing Discipline"

54.     In 2009, the rental industry experienced price volatility and increasing declines in pricing in order to attract customers.  Rental industry consultant and former HERC President Dan Kaplan said "rate declines were being fed by a lack of discipline; 'not only by the larger rental companies but also by the independent firms. Effectively, we are beginning to see a rental rate war in which everyone loses.'"[24]

55.     Kaplan was a frequent critic of the pricing trends he saw in the industry.  In 2010, Kaplan again discussed the downward price pressure and competition.[25]  He stated that in order to stabilize prices, it would be beneficial if one company could acquire "significant market share" to

---

[24] Murray Pollok, *North American 'rates war' starting warns Kaplan*, KHL Group LLP (May 14, 2009), available at https://www.khl.com/1037013.article.
[25] *Positioning for 2011*, Rental Equipment Register (Jan. 15, 2010), available at https://www.rermag.com/news-analysis/interviews/article/20944213/positioning-for-2011.

"be able to take action to drive pricing on their own behalf. That would be constructive for the industry."[26]

56.    In an article he authored in the Rental Equipment Register, Kaplan set forth the basis for the scheme.[27]

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it . . . .  I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry . . . . ***Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management*** . . . . The traditional thinking is that when you price, you hope the competition follows, while expecting that they won't. But this is not a traditional time, and ***the entire industry must accept rate responsibility together*** . . . .  Right now, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.[28]

57.    In 2011, in response to this "pricing pain," the American Rental Association ("ARA") set out to create its Rental Market Metrics, which would provide rental companies with clear definitions and methods to calculate four (4) key rental inputs.  "ARA Rental Market Metrics allow every rental business to compare itself to every other rental business regardless of size because they are size neutral: dollar (financial) utilization, time utilization, fleet age and calculations to determine how rental rates change from one period to the next."[29]

---

[26] *Id.*
[27] Dan Kaplan, *The Clock Is Ticking on Rate Discipline*, Rental Equipment Register (Sept. 1, 2010), available at https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline.
[28] *Id.* (emphasis added).
[29] John McClelland, ForConstructionPROS.com, *Measure Performance for Maximum Gain: The American Rental Association defines the key elements of rental metrics in attempt to unify the assessment and comparison of rental business performance* (June 26, 2013), at https://www.forconstructionpros.com/business/article/10977481/the-american-rental-association-provides-guide-for-assessment-of-rental-business-performance.

### B. Rouse Supplies the Means for "Pricing Discipline"

58.     Rouse was originally an auction company specializing in used construction equipment. In or around 2000, Rouse exited the auction market and focused instead on the information services sector in the construction industry.

59.     In the 2008-2009 timeframe, Defendants United Rentals, HERC, and H&E approached Rouse to ask if it would create a benchmarking service that focused on the construction equipment rental market. These companies thought Rouse could create the means to allow rental companies to pool their data and provide them with greater insight. A Rouse Senior Vice President explained:[30]

> It was really in the 2008/2009 time frame that we talked with a number of the different rental companies and we saw an opportunity to do something like the valuation benchmarking that we were doing on used equipment but on their core rental business and give them measurable benchmarks for rental rates and utilization. So we launched that service in 2011 with five companies.

60.     As noted above, some of these companies publicly suggested the need for the construction rental industry to work more cooperatively. For example, in 2010, former president of Defendant HERC, Dan Kaplan, stated in an article titled "The Clock is Ticking on Rate Discipline" that rental companies were engaged in aggressive price competition resulting in a race to the bottom. He also wrote that "the entire industry must accept rate responsibility together."[31]

61.     Kaplan's call for more coordinated conduct was met with approval. An article in the Rental Equipment Register noted that "[t]he comments and emails we have seen in regard to Dan Kaplan's column last month on the rental rate suicide this industry seems determined to commit shows that he touched a few nerves on the topic." The article offered a justification for

---

[30] The Rental Journal Podcast, Episode #135 – Phil Mause, at https://www.therentaljournal.com/podcast-episodes/phil-mause.
[31] *See* Dan Kaplan, *The Clock Is Ticking on Rate Discipline*, Rental Equipment Register, *supra*.

"rate discipline": "In a way, continually slashing rates and using rate discounting as a method to sell your business means selling the industry short, not valuing the contributions you are making to your customers' businesses."[32]

62.     In 2011, Rouse began working with the ARA to create rental metrics for the industry.  Rouse "was instrumental in helping to develop" the ARA Rental Market Metrics, which provided clear definitions and methods to calculate four (4) key rental metrics.[33]  These metrics allowed "every rental business to compare itself to every other rental business regardless of size because they are size neutral: dollar (financial) utilization, time utilization, fleet age and calculations to determine how rental rates change from one period to the next."[34]

63.     Rouse used the ARA criteria, which it helped develop, to create its benchmarking platform.  Only a month after the ARA released their Rental Market Metrics, Rouse launched its service with five (5) rental companies.

64.     The Rouse platform initially provided its construction equipment rental companies "an overview of [a] firm's rental metrics for free" in exchange for providing its data with Rouse.[35]  Rouse then began offering a more wide-ranging subscription service to its rental company clients that provides more in-depth information and encompasses all of the ARA Rental Market Metrics by equipment type.[36]

---

[32] Michael Roth, *Rental Rates Endanger Progress of Rental Industry: The comments and emails we have seen in regard to Dan Kaplan's column last month on the rental rate suicide this industry seems determined to commit shows*, Rental Equipment Register (Oct. 1, 2010), available at https://www.rermag.com/business-technology/business-info-analysis/article/20942889/rental-rates-endanger-progress-of-rental-industry.

[33] Michael Roth, *Rouse Asset Services offers Rental Metrics Benchmark Service*, Rental Equipment Register (Dec. 1, 2012), available at https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service.

[34] John McClelland, ForConstructionPROS.com, *Measure Performance for Maximum Gain: The American Rental Association defines the key elements of rental metrics in attempt to unify the assessment and comparison of rental business performance* (June 26, 2013), at https://www.forconstructionpros.com/business/article/10977481/the-american-rental-association-provides-guide-for-assessment-of-rental-business-performance.

[35] John McClelland, *Measure Performance for Maximum Gain*, *supra*.

[36] John McClelland, *Measure Performance for Maximum Gain*, *supra*.

65.     This was the foundation for the Rouse Cartel.  Defendants United Rentals, HERC, and H&E participated as founding members. The other founding members were NES Rentals and NEFF Rentals, both of which have since been acquired by United Rentals. All of these founding companies allowed Rouse to collect their competitively sensitive data, and they began sharing and pooling their CSI with Rouse.

**1.  The Rental Defendants and Other Rental Companies Share CSI With Rouse**

66.     By 2015, just four (4) years after its launch, over fifty (50) rental company clients had signed up to use the benchmarking service, which included the Rouse Rental Insights price ("RRI Price")  that was created by collecting and pooling clients' CSI.[37] To encourage additional rental companies to participate, Rouse offered its basic product at no cost, but only in exchange for each respective rental company's data.

67.     Rouse touted the success of its product:

> We long believed that rental companies needed a way to measure performance on rental rates and key operating metrics, and we're proud to have collaborated with the ARA Rental Market Metrics standard that is utilized in our Rental Metrics Benchmark Service . . . .  The rapid growth of our Rental Metrics Benchmark Service demonstrates how valuable this information is to rental companies, and we're looking forward to additional growth here in the U.S. and internationally.
>
> Through its Rental Metrics Benchmark Service, Rouse Analytics collects invoice level transaction data and nightly fleet snapshots from participating rental companies and reports industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age and other key performance metrics at a local market level. Participating rental companies receive a summary level comparison of their rental rates and other key performance metrics to local

---

[37] *Rouse Analytics Rental Benchmark Service Tops 50 Participants*, Rental Equipment Register (Feb. 17, 2015), at https://www.rermag.com/news-analysis/headline-news/article/20950099/rouse-analytics-rental-benchmark-service-tops-50-participants.

market benchmarks every month at no charge and then have the
option to purchase more detailed reporting.[38]

68.     In December 2020, Ritchie Brothers, "the world's largest heavy equipment
auctioneer and provider of end-to-end services," acquired Rouse.[39] Ritchie Brothers conducts
online and in person auctions in the construction, mining, transportation and agriculture
industries.[40]

69.     At that time, Ritchie Brothers was performing its own data analytics for the auction
industry.[41] This acquisition allowed Rouse to combine its own data analytics platform and client
base with the data from Ritchie Brothers, which significantly enhanced Rouse's benchmarking
program. As a result, Rouse was able to provide its customers with even more comprehensive data
and become that much more indispensable to them.

70.     Rouse clients soon began dominating the Rental Equipment Register top 100 list of
rental companies ("RER 100"). By 2022, ninety percent (90%) of the total revenue earned by the
top 100 were Rouse customers. Two years later, each of the top ten (10) construction equipment
rental companies was using Rouse's RRI, as well as seventy (70) of the top 100. Overall, now
more than 400 companies in North America use Rouse RRI.

### 2.     Industry Participants Credit Rouse for "Pricing Discipline" and Increased Prices

71.     Rouse's rental company clients touted Rouse's platform for increasing and
stabilizing rental rates. A former CEO of one of the smaller rental companies, when asked if

---

[38] *Id.*
[39] Michael Roth, *Ritchie Bros.' Acquisition of Rouse Services Finalized*, Rental Equipment Register (Dec. 9, 2020), at https://www.rermag.com/mergers-acquisitions/article/21149978/ritchie-bros-auctioneers-ritchie-bros-acquisition-of-rouse-services-finalized.
[40] Richie Brothers changed its name to RB Global in 2023.
[41] Michael Roth, *Ritchie Brothers Market Reports Shows Steady 2020 Used Equipment Pricing*, Rental Equipment Register (Dec. 15, 2020), at https://www.rermag.com/news-analysis/headline-news/article/21144957/ritchie-brothers-market-reports-shows-steady-2020-used-equipment-pricing.

pricing among competitors became a "race to the bottom," the executive discussed Rouse's impact on the industry:[42]

> "I don't believe we're in a race to the bottom, not anymore at least. Rouse has essentially standardized a lot of the price competition in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices."[43]

72.     Brad Barber, President & CEO of H&E Equipment Services, said "The services offered by Rouse, and more specifically the data they supply for our equipment rental business, are invaluable to our company."[44]   Doug Dougherty, CEO of Cooper Equipment Rentals said "Rouse has provided incredible value in its strategic partnership with the industry," and John Johnson, Vice President, Holt of California said that "Rouse Services has been a game changer for the rental industry."[45]

73.     Rouse regularly announced how many rental companies had signed up as customers of Rouse.[46]  As each client joined, they agreed to provide their CSI to Rouse in exchange for their competitors' data, which would allow them to confidently raise their rental prices in line with their competition.

## C.  The Market for Construction Rental Equipment is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel

74.     The market for the rental of construction equipment is characterized by numerous features, referred to as "plus factors," that render the industry susceptible to collusion, such that

---

[42] *Sunbelt vs United: the Nature of Equipment Rental Competition, Former CEO of Nickell Rental*, IP In Practice Interview (Feb. 1, 2024), at https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition.
[43] *Id.*
[44] Kevin Viehland, *63 Rouse customers featured in latest RER 100* (June 15, 2021), at
https://www.rouseservices.com/63-rouse-customers-featured-in-latest-rer-100/.
[45] *Id.*
[46] *See, e.g.*, *Rouse Services Added 60 New Customers, Appraised More Than $50B in 2022*, Monitor Daily (Mar. 7, 2023), at https://www.monitordaily.com/news-posts/rouse-services-celebrates-record-breaking-customer-growth-launches-fleet-manager/.

the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) inelastic consumer demand, (4) market concentration, (5) relative fungibility of construction rental equipment, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at events and through trade associations.

75. First, as noted previously, establishing a business that rents construction equipment requires a substantial capital outlay and clearing a variety of other significant entry barriers including, for example, developing a customer base. Thus, new entrants into the construction equipment rental market are unlikely to discipline cartel pricing.

76. Second, companies that rent construction equipment face high exit barriers. Renters would incur substantial costs switching equipment providers mid-project, and where price escalation is occurring, they might not have a lower priced option in reasonable proximity to their current project. As such, renters cannot easily turn to alternatives to the rental companies in the Rouse Cartel to discipline cartel pricing.

77. Third, the demand for rentals of construction equipment is relatively inelastic. The only realistic alternative to renting is buying, and as explained previously, that is not a financially feasible option for most contractors. Thus, no reasonable substitutes exist to discipline cartel pricing.

78. Fourth, the market for construction equipment rentals is highly concentrated. Given the high barriers to entry, there are only a limited number of rental companies that exist, and the market is dominated by the ten largest companies, all of which are in the Rouse Cartel.

79. Fifth, construction equipment is relatively fungible. One 2020 Caterpillar bulldozer is largely the same as another. Rental company customers rarely have any additional information

21

that would distinguish one piece of equipment from another when making spending decisions. This fungibility is what enables Rouse to present its pricing by "Cat Class."

80.     Sixth, Rouse's participating rental companies share competitively sensitive information with one another, both directly and by using RRI as a conduit. As described above, this would be against their independent self-interest absent a conspiracy to collude.

81.     Seventh, Rouse and participating rental companies have had ample opportunities to collude. Rouse regularly sponsors industry conferences. Recently, a Vice President at Rouse Rental Insights was on a panel called "Leveraging Data and Technology to Increase Revenue and Improve Efficiency." At that conference, Rouse said that RRI "enables equipment rental companies to outperform competitors by optimizing fleet management, pricing strategies, and maintenance processes."

82.     Finally, industry trade associations offer Rouse and participating rental companies additional opportunities to conspire. For example, Rouse and the Rental Company Defendants are all members of the ARA, which offers training, consumer research, and myriad networking opportunities. There are a number of other trade associations and groups that the Rental Company Defendants, Ritchie Bros., and Rouse participate in.

## V.     DEFENDANTS' UNLAWFUL SCHEME TO ARTIFICIALLY INFLATE PRICES

### A.     Defendants' Exchange of Confidential Sensitive Information Violates the Sherman Act

83.     The Rental Company Defendants entered into a horizontal agreement among and between themselves to establish the "Rouse Cartel," which allows the participants to limit competition and raise prices by using a mutual exchange of their CSI with Rouse—and each other—to further their price fixing conspiracy.

84.     Rouse requires participants in the Rouse Cartel to provide them with their CSI in exchange for receiving competitor pricing and other data from Rouse.  Rouse "pull[s] data directly from our clients' systems" and "uses actual rental invoices and daily fleet snapshots from over 400 companies across North America . . . to provide clients with comparisons of the rental rates, utilization, and other key performance metrics to industry benchmarks by Cat Class specific to each market they operate in."[47]  The use of actual rental invoices ensures that the pricing information provided to its clients is more accurate than using list rates or quoted rates, which are not always utilized.

85.     Rouse uses the CSI data it has collected from Rental Company Defendants and pools it together to provide Rouse's clients, including the Rental Company Defendants, with the same RRI Price, for each piece of rental equipment.[48]

86.     Rouse calculates the RRI Price using a proprietary formula which analyzes clients' pooled CSI data, and Rouse's assessment of seasonality of demand and view of market conditions.

87.     Rouse discourages price competition by enabling its clients to set prices at or above the reported RRI Price.  This creates upward price pressure on rental prices from all of Rouse's rental company clients.

88.     Rouse tries to hide its anticompetitive conduct by calling the RRI Price a "benchmark" rather than referring to its true nature: a tool for the Rental Company Defendants to effectuate their price fixing conspiracy.

---

[47] *See* https://www.rouseservices.com/solutions/rental-insights/.
[48] *See Rouse Asset Services offers Rental Metrics Benchmark Service*, Rental Equipment Register (Oct. 1, 2012), at https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service.

89.     A benchmark is typically a tool used to measure past performance.  However, in this case Rouse includes a recommended RRI Price, which enables Defendant Rental Companies to set a common price going forward and avoid competing on price.

90.     One article touting Rouse's "benchmark" service explains how specific the pricing data it provides, which allows competitors to know exactly how to price their products:

> It's one thing to tell your managers and sales staff they need to bring their rates up, but quite another to tell them with certainty they are 12-percent below average for the market in generators, 14-percent below market average in mid-sized skid-steer loaders, and 17-percent below market average in 19-foot scissor lifts and tell them the exact amount of the average rate.[49]

91.     Rouse markets its software and data analytics platform (including its RRI Price) to construction equipment rental companies by promoting their customers' ability to increase profitability.  They claim their "multi-layered approach presents an unprecedented view" of their customers' "complete revenue stream, enabling [them] to benchmark against industry averages from the beginning to the end of [each] asset's lifecycle."[50]  Finally, they claim that with their "comprehensive data and analytics, [customers] can proactively adapt to market changes, optimize asset utilization, and maximize profitability throughout [their] business journey."[51] This is just shorthand for enabling a price fixing scheme through the sharing of sensitive pricing and other data with their competitors.

92.     The Rental Company Defendants were aware their competitors were also providing their companies' CSI to Rouse and that Rouse was pooling this data and providing it to the Rental Company Defendants for them to use to increase prices to supra-competitive levels.

---

[49] *Id.*
[50] *Introducing Rouse Rental and Equipment Insights: Your Premier Data-Driven Solution for Fleet Performance Benchmarking*, Point-of-Rental Software, at https://www.point-of-rental.com/introducing-rouse-rental-and-equipment-insights-your-premier-data-driven-solution-for-fleet-performance-benchmarking/.
[51] *Id.*

93.     Absent collusion, it would be against any of the individual Rental Company Defendant's unilateral economic self-interest to allow Rouse to collect their highly commercially sensitive information and distribute it to its horizontal competitors. In other words, providing such commercially sensitive information to Rouse to assist competitors in setting their own prices would be in each Rental Company Defendant's economic self-interest **only if** each Rental Company Defendant knew they would in turn receive the benefit of their competitors' CSI in pricing.

**B. Rental Companies Use the RRI Price to Unlawfully Raise, Fix, Maintain or Stabilize Rental Prices of Construction Equipment**

94.     Defendant Rental Companies use the Rouse RRI Price to set their own rental prices. The Rental Companies can adjust the rental pricing set by RRI Price based upon market conditions.

95.     A Rouse executive explained that a customer can view their own information in a variety of ways. "At the total fleet and category level, we've got four different ways to look at it. . . ." He went on to explain:

> So at any moment, if a rental company wants to know how it is doing with 19-foot scissorlifts in Birmingham compared to the competition, or air compressors in Memphis or any piece of equipment in any covered market for any time period, all it takes is a few keystrokes. A company can, also with a few keystrokes, determine how it is faring in physical or dollar utilization, rates, or fleet age compared to its competitors in markets covered by Rouse. It can also determine how it is faring in ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus its competition.[52]

96.     An executive at Sunbelt touted the benefits that Rouse's products brought to it: "We leverage Rouse in a number of ways really... rate and utilization are the most important ways . . . . [T]he most valuable thing Rouse helps us with understanding where we sit in the marketplace[,] whether we are overperforming or underperforming to allow us to make adjustments."[53]

---

[52] See *Rouse Asset Services offers Rental Metrics Benchmark Service*, *supra*.
[53] https://www.youtube.com/watch?v=l7KmTzc29NQ.

97.     According to the Heavy, a website that uses data to analyze the construction equipment industry, the "primary benefit" of Rouse's "retail rental benchmarking product" is "to ensure business is not lost by being above market rate. Often, for those well below market rate when first using the product, it's an opportunity to significantly increase rates."[54]

98.     A former executive of one construction rental company (eventually acquired by Defendant Sunbelt) noted the effect of the RRI Price on their industry:

> Over the last few years, its use has become pretty ubiquitous. If you're a mid-size or larger company, you're using Rouse. . . .  Both United and Sunbelt have consistently led in saying, "We're going to raise prices, we're going to get prices higher." So, everyone knows what United is doing.[55]

99.     He also noted that companies using Rouse were "more disciplined" in pricing during periods where prices declined, because they knew "going to the lowest price was not the best strategy, and they used Rouse and others."[56]  When asked what had changed over the last decade to make "national players"  "so price disciplined," he stated that "tools like Rouse provide them with a safety net when their sales reps claim that prices are falling."[57]

100.     Rouse partnered with companies who worked in other segments of the construction equipment rental market to have Rouse RRI integrated into those platforms.  For example, Rouse partnered with Fame Intel, a software company whose platform "handles every aspect of your rentals from reservation to return, which maximizes utilization and return on assets."[58]  In support of the new partnership using Rouse data and analytics, Fame Intel stated, "Imagine having a cheat code in the equipment rental world. With the Rouse data on your Fame Rental dashboard that's

---

[54] https://www.totheheavy.com/glossary/rouse-services/.
[55] *Sunbelt vs United: The Nature of Equipment Rental Competition*, *supra*.
[56] *Id*.
[57] *Id*.
[58] https://fameintel.com/.

exactly what it would feel like"[59] and that their integration with Rouse Rental Insights would allow their customers to "[assure] that your pricing is in line with your competition," obtain "the ability to see 'who's renting what'," and "thrive in a competitive market environment."[60]

101.    Rouse ensures that as many construction rental companies as possible have access to its RRI Price, which allows other market participants to monitor and enforce the RRI pricing, which maximizes the prices charged by the industry as a whole.

102.    Rouse has allowed its software to be integrated with dozens of enterprise resource planning (ERP) software vendors and integrated software partners.  This makes the RRI pricing easily accessible to a wide range of small and mid-sized rental companies. Being fully integrated with these software systems allows the direct transmission of data to Rouse.

103.    Rouse meets with and advises its clients, including Defendant Rental Companies, on how to use the RRI Price and other tools provided by Rouse to achieve higher prices.  One example of this is the Rouse Analytics – Online Dashboard User Guide.[61]  This guide explains how Rouse's online dashboard provides its customers with a wealth of information that allows customers to compare every detail of their business and compare it to their competitors to maximize pricing.  Among other information provided, it even "[c]ompares [the customers'] invoiced rental revenue to revenue that would have been earned if book rates had been charged on every transaction."[62]  Similar comparisons are available for customers' monthly, weekly and even daily rates.[63]

---

[59] *Rouse Is in the House: Gain a Competitive Edge with FameAir's Rouse Rental Insights Integration*, Fame Intel (Oct. 31, 2024), at https://fameintel.com/rouse-is-in-the-house/.
[60] *Id.*
[61] Rouse Analytics – Online Dashboard User Guide, available at https://rdo.rouseanalytics.com/assets/images/RDO_User_Guide.pdf.
[62] *Id.*
[63] *Id.*

104.    Rouse customers can use the RRI Price to police adherence to their unlawful agreement by utilizing alerts and including fields in the software that self-populate. The sample chart included below shows the rental rates on the left and a blue bar shows actual transactions completed by competitors within that price range. The RRI Price is represented by the line dividing the green and red pricing zones. Prices in green indicate that the price is in the top quartile of prices, and red indicates prices are in the bottom quartile.[64]



105.    By allowing all of its customers to see the prices charged, Rouse discourages price competition, and more specifically, the layout of the relevant information is designed to encourage customers to set their prices in the green zone, which is the RRI Price or higher.

106.    Rouse provides significant information about the rental equipment market. Such information includes key metrics that are collected from the pooled CSI, which contain: (1) rental rates, (2) rental rate change, (3) physical utilization, (4) financial utilization, (5) fleet age, (6)

---

[64] *Id.*

revenue distribution, and (7) rental growth. Rouse provides these for each class of rental equipment a rental company offers.

107.    Rouse provides pricing comparisons at the customer level as compared to the benchmark price on all key reported metrics, as shown below, which further enables and encourages the policing of the RRI Price.[65]



108.    The Rouse RRI also has pages dedicated to each client's sales teams, which include comparisons of each sales representative's performance against the benchmark price.[66]

---

[65] *Id*.
[66] *Id*.



109. Rouse also includes a Sales Representative Dashboard that provides summary metrics and comparisons at an individual sales representative level.[67]



---

[67] *Id.*

110. Rouse encourages its clients to utilize this feature to determine if salespeople are performing as anticipated, by either achieving or underperforming relative to the RRI Price.

111. Members of the Rouse Cartel have stated that they set their prices at the recommended RRI Price approximately ninety percent (90%) of the time.

112. Participation in the Rouse Cartel has paid off for the Rental Company Defendants. The industry publication, Rental Equipment Register ("RER"), puts out an annual list of the top 100 rental companies by rental volume. In 2019, "[t]he new RER 100 totaled $25.2 billion, a record total for the listing, and a 15-percent increase over 2018's $21.9 billion."[68] As of 2021, the RER 100 list of the largest rental companies included sixty-three (63) companies that are Rouse customers, and made up 8 of the top 10.[69] According to the RER 100 lists, Defendant United Rentals' total rental volume in 2021 increased 14.9% over 2020, and it saw another 23.3% increase in 2022. Defendant Sunbelt Rentals' total rental volume increased 15.4% over 2021, which increased another 26.7% in 2022. Defendant HERC saw a 23.8% increase in 2021, and 33.6% in 2022. Defendant H&E saw increases of 10.1% and 31%, respectively.[70]

113. The Rental Company Defendants and Rouse have violated and continue to violate U.S. antitrust laws. The Rental Company Defendants, who comprise a majority of the largest rental companies and control much of the construction equipment rental market, do not set their prices independently. Instead, they outsource that function to a third party, Rouse, in an attempt to make an end run around the antitrust laws. By their collective actions through Rouse, they have

---

[68] Michael Roth, *The 2019 RER 100 Tops $25 Billion: The RER 100 enjoyed a 15-percent rental revenue jump in a record year for the rental elite*, Rental Equipment Register (May 11, 2019), at https://www.rermag.com/rental-news/article/20954702/the-2019-rer-100-tops-25-billion.
[69] *Id.*
[70] *See* RER 100 (May 2022) at https://secure.viewer.zmags.com/publication/c5f1bfef#/c5f1bfef/14 and RER 100 (April/May 2023) at https://secure.viewer.zmags.com/publication/9ca3887d#/9ca3887d/20.

eliminated price competition between and among themselves and artificially increased prices in the construction equipment rental market.

114. Plaintiff and the members of the proposed Class suffered substantial harm from the supra-competitive prices they paid to rent construction equipment as a direct and proximate result of Defendants' unlawful agreement. Plaintiff brings this action to recover treble damages, injunctive relief and any other appropriate remedy on behalf of itself and all others similarly situated.

## VI. THE RELEVANT MARKET

115. The instant action alleges a horizontal price-fixing arrangement to fix, stabilize and raise prices of construction rental equipment. Price fixing among horizontal competitors is per se illegal and Plaintiffs need not allege or define a relevant market.

116. To the extent a relevant market must be defined, the relevant product market here is the market for construction equipment rentals.

117. There are no economic substitutes for construction equipment rentals. Customers cannot purchase the construction equipment in lieu of renting, given the significant cost incurred to purchase even one piece of construction equipment.

118. Further, construction projects generally require multiple diverse pieces of construction equipment. To purchase even a small amount of construction equipment would cost millions of dollars. Rental companies are responsible for the maintenance and repair of the construction equipment, as well as its storage, which are significant costs incurred by construction companies that own their equipment.

119.    By renting construction equipment, customers avoid the significant depreciation associated with owning construction equipment, as well as the cost of insurance policies on the equipment.

120.    The relevant geographic market is the United States. The Rental Company Defendants are the dominant sellers of construction equipment rentals nationally moving equipment across the country on a regular basis.

121.    The U.S. construction rental market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the Small but Significant and Non-Transitory Test ("SSNIP test").  The SSNIP test is a tool used in antitrust analysis to define the relevant market by determining if a monopolist could profitably raise prices by a small but significant amount. If a sufficient number of customers are likely to switch to alternative products and the lost sales would make such price increase unprofitable, then the market has not been defined properly.

122.    Here, the SSNIP test is satisfied.  Pursuant to the construction rental companies' agreement not to compete on price, the companies can increase prices "year over year, between 5% and 12%" in the U.S., yet those increases have not caused sufficient numbers of customers to switch to alternative products such that the SSNIP has become unprofitable to rental companies.

123.    The relevant market for construction equipment rentals is corroborated by widespread recognition in the industry that construction equipment rental is a distinct market from construction equipment sales. Moreover, there is widespread recognition within the industry that the Rental Company Defendants dominate the national market for construction equipment rentals. Finally, the construction equipment rentals market has its own pricing system separate from construction equipment sales, and driven by the RRI Price.

## VII. THE EFFECTS OF DEFENDANTS' ANTICOMPETITIVE SCHEME

124. The purpose of Defendants' conspiratorial conduct was to increase, fix, or maintain the rental rates in the construction equipment rental market in the United States, and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiff and the Class have paid higher and artificially inflated prices for construction equipment rentals during the Class Period.

125. Due to the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury, having paid higher rental rates in the construction equipment rental market during the Class Period than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff and the Class have suffered damages.

126. This is an injury of the type that the antitrust laws were meant to punish and prevent.

127. Defendants' anticompetitive conduct had anticompetitive effects that impacted all purchasers in the construction equipment rental market including: (a) stabilizing, maintaining or fixing the rental rates in the construction equipment rental market at artificially high levels, (b) restraining or eliminating competition among Defendants in the construction equipment rental market, and (c) depriving Plaintiff and the Class of the benefit of free and open competition.

128. The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all individuals and entities renting construction equipment in the United States.

129. By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S. and caused antitrust injury to Plaintiff and members of the proposed Class.

130. While the conspiracy continues, Plaintiff and proposed Class members will continue to suffer losses.

131.    Defendants' price fixing conspiracy is per se unlawful.

## VIII.    CLASS ACTION ALLEGATIONS

132.    Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented construction equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such rental company, at any time during the period of March 31, 2021, until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

133.    The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

134.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

135.    **Numerosity.**  The Class is so numerous that joinder of all members in this action is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contain tens of thousands of similarly situated proposed Class members.   The Class members are readily identifiable and are ones for which records should exist.

136.    **Typicality.**  Plaintiff's claims are typical of those of the Class.  Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

137.    Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to rent construction equipment than they otherwise would have in a competitive market.

138.     **Adequacy.**  Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class.  Plaintiff is willing and able to assume the duties of a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

139.     **Common Questions of Law and Fact Predominate.**  Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual Class members, because the Defendants have acted and refused to act on grounds generally applicable to the Class.

140.     Questions of law and fact common to the Class include:

a.     Whether Defendants entered into a formal or informal contract, combination, conspiracy, or common understanding to fix, inflate, maintain or stabilize the price and/or artificially suppress supply of construction equipment rentals from competitive levels;

b.     Whether such agreement constituted violations of the Sherman Antitrust Act;

c.     If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated the price and/or artificially suppressed supply of construction equipment from competitive levels;

d.     The proper measure of damages; and

e.     The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

141.    Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

142.    **Superiority.**  Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

143.    **Injunctive Relief.**  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CAUSES OF ACTION

### COUNT ONE

### Violation of Section 1 of the Sherman Act, 15 U.S.C. §1

144.    Plaintiff repeats and realleges all previous averments as if fully set forth herein.

145.    Plaintiff seeks monetary and injunctive relief on behalf of themselves and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

146.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting construction equipment to Plaintiff and the Class.

147.    Defendants formed a cartel to artificially inflate the price and/or decrease the supply of construction equipment rentals from competitive levels.

148. Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

149. Defendants have committed various acts in furtherance of this conspiracy, including, but not limited, to the following:

    a. Rouse created its RRI Price tool at the behest of Defendants United Rentals, HERC, and H&E;

    b. Rouse advertised and sold its pricing tool to additional rental companies as a means of raising prices and achieving greater profits;

    c. The Rental Company Defendants agreed to provide real-time, non-public, confidential, competitively sensitive, and detailed internal data to Rouse for use in Rouse's collective pricing;

    d. The Rental Company Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

    e. The Rental Company Defendants charged customers for rental equipment at the rate set by Rouse's pricing tool; and

    f. Rouse empowered the Rental Company Defendants to enforce the collective Rouse prices.

150. The Rouse Cartel has caused Plaintiff and the Class to suffer overcharge damages.

151. There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

152.    The Defendants' cartel is unlawful under a per se mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

153.    As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and be deprived of the benefit of free and fair competition unless Defendants' conduct is enjoined.

154.    Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

155.    Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## XII.    PRAYER FOR RELIEF

156.    WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests that:

A.    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel;

B.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick look, or rule of reason mode of analysis;

C.    A judgment enjoining Defendants from engaging in further unlawful conduct;

D.    An award of attorneys' fees and costs;

E.    An award of pre and post judgment interest on all amounts awarded; and

F.    Such other relief as the Court deems just and equitable.

**XIII.  JURY DEMAND**

157.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff requests a trial by jury

on all issues so triable.

Dated: May 6, 2025                    Respectfully submitted,

*/s/ Katrina Carroll*
Katrina Carroll
Kyle Shamberg
**CARROLL SHAMBERG LLC**
111 West Washington Street, Suite 1240
Chicago, IL 60602
Tel: (872) 215-6205
katrina@csclassactions.com
kyle@csclassactions.com

*Liaison Counsel*

William G. Caldes, Esquire *(pro hac vice forthcoming)*
Jeffrey L. Spector, Esquire *(pro hac vice forthcoming)*
Alicia M. Sandoval, Esquire *(pro hac vice forthcoming)*
**SPECTOR, ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
asandoval@srkattorneys.com

Michael J. Boni *(pro hac vice forthcoming)*
Joshua D. Snyder *(pro hac vice forthcoming)*
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: (610) 822-0200
mboni@bonizack.com
jsnyder@bonizack.com

David P. McLafferty *(pro hac vice forthcoming)*
**MCLAFFERTY LAW FIRM, P.C.**

923 Fayette Street
Conshohocken, PA 19428
Tel:(610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

*Counsel for Plaintiff*